# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| SHIRLEY VAZQUEZ,<br><br>*Plaintiff*,<br><br>v.<br><br>UPSON COUNTY HOSPITAL, INC. AND PAUL S. PENN, III,<br><br>*Defendants*. | CIVIL ACTION NO.<br>5:18-cv-00073-TES |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff Shirley Vazquez, a woman of Colombian descent, contends Defendant Upson County Hospital, Inc. ("Upson") and Defendant Paul Penn ("Penn") discriminated against and subjected her to a racially hostile work environment in violation of 42 U.S.C. § 1981.[1] Additionally, Plaintiff asserts a claim for retaliation in

---

[1] In her complaint, Plaintiff also made a claim for racial discrimination pursuant to 42 U.S.C. § 1981. Defendants argue that the Court should grant their motion for summary judgment on Plaintiff's racial discrimination claim, because Plaintiff fails to produce evidence of discrimination in her termination or employment. [Doc. 26-1 at 12–17]. Plaintiff responded as follows: "[a]s a threshold matter, the best statement of the nature of this case is to explain what it is not. It is not because the discharge of Plaintiff was racially motivated or the end product of manifest racial animus." [Doc. 30 at p. 14]. "When a non-moving party fails to address particular claims in the moving party's motion for summary judgment but responds to other arguments, the non-moving party abandons these claims." *John v. CSX Transp., Inc.*, 210 F. Supp. 3d 1357, 1373 (M.D. Ga. 2016) (citing *Jolley v. Triad Mech. Contractors*, No. 5:13–cv–247 (MTT), 2015 WL 1299852, at *8, n. 16 (M.D. Ga. March 23, 2015)). Accordingly, Defendants' summary judgment motion is **GRANTED** against Plaintiff on her racial discrimination claim.

violation of the False Claims Act ("FCA"). Before the Court is Defendants' Motion for Summary Judgment [Doc. 26], which the Court **GRANTS** for the following reasons.

## FACTUAL BACKGROUND

Defendant Upson hired Plaintiff Shirley Vazquez on June 28, 2010, as its Clinical Resources Director, a position sometimes referred to as Case Management Director. [Doc. 31-1 at p. 1]. When Plaintiff was hired, she signed an acknowledgement that she received Upson's employee handbook, which included Upson's harassment and discrimination policies, and policies for appealing management decisions that cause employees to be dissatisfied with their employment. [Doc. 30-1 at ¶¶ 4, 5]. Until Defendant Penn became Chief Executive Officer ("CEO") in May 2016, Plaintiff always reported to John Williams, Upson's Chief Financial Officer ("CFO"). [Doc. 31-1 at p. 2]. Later, Plaintiff was promoted to additional Directorships, including the Quality team, Recovery Audit Contractor ("RAC")[2] audit team, and the Pre-certification Department. [*Id.* at p. 2; Doc. 30-1 at ¶ 2]. When Penn took over, he restructured the organization so that Plaintiff reported to him. [Doc. 30-1 at ¶ 6; Doc. 31-1 at p. 4]. Prior to Penn's arrival at Upson, a company that managed Upson told Penn that he should consider replacing Plaintiff, due to a history of disruption. [Doc. 31-1 at p. 4].

---

[2] RAC's review claims on a post-payment basis. The RACs detect and correct past improper payments so that CMS and Carriers, Fls, and MACs (a position undefined by either party) can implement actions that will prevent future improper payments. https://www.cms.gov/Research-statistics-data-and-systems/monitoring-programs/medicare-FFS-complianceprograms/recovery-audit-program/index.html.

2

Plaintiff's hostile work environment claims arise out of the following seven occurrences within a span of a little more than a year:

1) Prior to May 2016, Sally Barker told Plaintiff that "Macon was a very Monday place. Upon inquiry, she told Plaintiff that Monday was how they referred to African Americans because nobody liked a Monday." [Doc. 31-1 at pp. 5–6]. Penn became aware of this by an anonymous letter he received after Plaintiff was terminated. [Doc. 37-1, Penn Depo., 6:2–15].

2) Additionally, sometime in November 2016, Penn had a two-hour conversation with Plaintiff over dinner. [Doc. 37, Penn. Depo., 67:4–68:22]. Plaintiff opened up concerning her family and past, including stories about her Colombian heritage, mother, and family. [*Id.* at 67:6–12, 68:3–9; Doc. 30-3 at ¶ 42]; [Doc. 29, Vazquez Depo., 146:19–21]. In response, Penn shared about his brother who he believes is a very unique individual, including that his brother was married to a Jamaican woman at one point. [Doc. 37, Penn Depo., 67:6–20]. Penn alleged he opened up because they were connecting for the first time, but Plaintiff stated that this conversation served to underscore her racial differences rather than help her feel included. [*Id.* at 68:3–9; Doc. 30-3 at ¶ 44].

3) In December 2016, Penn took the administrative team to a Mexican restaurant. [Doc. 37, Penn Depo., 70:20–22]. While at the restaurant, Suzanne Streetman asked Plaintiff "[W]hat's in a Mexican sandwich?" [Doc. 29, Vazquez Depo., 138:8–23]. Before Plaintiff could respond, "Sally [Barker] interrupted and said it was two Mexicans and a woman." [*Id.* at 139:9–15].

4) On another day, upon DACA's[3] expiration, Sally Barker asked Plaintiff if she was packing her bag. [Doc. 37, Penn Depo., 73:1–3]. Penn witnessed the comment, but he did nothing aside from considering the comment an inappropriate joke or banter between two friends. [*Id.* at 73:3–8].

5) Sally Barker made a comment in an administrative meeting that the "new mandatory flu cards were yellow" rather than green, and Plaintiff "should tell the infection control guy how angry I was because he took away my 'green card.'"

---

[3] "DACA [Deferred Action for Childhood Arrivals] provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization." https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

3

[Doc. 30-3 at ¶50]. Penn testified that he did not remember that comment. [Doc. 37, Penn Depo., 73:9–16].

6) Around September 2017, Plaintiff stopped reporting to Penn and began reporting to Julie Long ("Long"), Chief Nursing Officer. [Doc. 30-1 at ¶ 6; Doc. 31-1 at p. 7]. Shortly after Plaintiff began reporting to Long, Long had a conversation with Plaintiff about Plaintiff's family and heritage, similar to the conversation Penn had with her. [Doc. 29, Vazquez Depo., 88:21–23]. In this conversation, Long immediately asked what race Plaintiff was, told her that she had gone to a Catholic church, told Plaintiff that her son's spiritual advisor was a Mexican woman named Lupita, and showed Plaintiff a picture of Lupita. [*Id.* at 89:1–9]. Plaintiff testified that this "led [her] to believe that she was also looking at [her] differently." [*Id.* at 89:24—90:2].

7) In November 2017, Plaintiff stated in her affidavit that Long, when speaking about problems the staff in the OB-GYN office were having, said "[i]t's just a black and white thing, Dr. Baker (a black doctor) makes everything about race." [Doc. 30-3 at ¶ 70].

Throughout Plaintiff's tenure, she never reported any instances of racial discrimination or harassment to the HR director, Rich Williams, who she was friends with. [Doc. 30-1 at ¶ 24].[4] Rich Williams testified that Plaintiff would have felt comfortable discussing workplace issues with him and had done so on other occasions. [Doc. 26-15 at ¶¶ 7–9]. Additionally, Plaintiff never complained to Penn about any of the comments or jokes. [Doc. 30-1 at ¶ 28]. When asked whether "[it's] ok to make comments regarding someone's race or ethnicity off the clock, but not on the clock[,]" Plaintiff responded "[w]ith [her] friends, [she] is okay with certain words and terms." [Doc. 29, Vazquez

---

[4] This fact is not disputed because Plaintiff admitted it in her response to Defendants' statement of undisputed material facts. *See* [Doc. 26-16 at ¶ 24]; [Doc. 30-1 at ¶ 24].

4

Depo., 148:8–12]. Plaintiff testified that she and Sally Barker were friends, at least at work. [*Id.* at 143:16–21].

Plaintiff expressed concerns to Dr. Brandon Boyce ("Boyce") that Dr. Ben Williams had patients that were being kept longer than medically necessary. [Doc. 36, Brandon Boyce Depo., 17:1—18:3]. Plaintiff opined that a peer review was necessary regarding three of Dr. Williams' patients' charts, and Boyce agreed. [*Id.* at 19:1–4, 23:14–20]. Following this, Boyce and Suzanne Streetman made the decision to request an internal peer review from Dr. Frederique. [*Id.* at 24:22–25:10]. Penn testified he was made aware of Dr. Williams' behavior by Plaintiff and Suzanne Streetman through the proper channels. [Doc. 37-1, Penn Depo., 39:24—40:22].

"Plaintiff reported concerns with billing practices as part of [her] job and had never been reprimanded or treated differently because of prior complaints." [Doc. 30-1 at ¶ 50]. However, referring to the situation involving Dr. Williams, "this was [Plaintiff's] first time asking for an outside agency to review the material" and also the "first time [Plaintiff] had ever taken it to the point that it was going out to a peer review." [Doc. 29, Vazquez Depo., 99:2–11].

On February 5th, 2018,[5] Plaintiff was terminated by Upson. [Doc. 26-12]. Defendants' brief alleges that Plaintiff "was terminated months after the discussion

---

[5] Plaintiff's brief in response to Defendants' Motion for Summary Judgment alleges that Plaintiff was fired on February 7, 2018, but the effective date of Plaintiff's termination was February 5th, 2018. *See* [Doc. 30, p. 11]; [Doc. 26-12].

5

regarding the peer review occurred." [Doc. 31 at p. 9]. However, the contents of a party's brief are not evidence. In contrast, deposition testimony and the items listed in Rule 56(c)(1)(A) are considered evidence. Plaintiff testified that "two weeks [following Plaintiff raising the issues with Dr. Williams], [Plaintiff] was terminated[.]" [Doc. 97, Vazquez Depo., 96:17–19]. "The articulated reason for firing Plaintiff was that she was perceived not to be supportive of leadership, that she rolled her eyes at times and huffed, that she was not a servant leader and that her management wanted to take the hospital in a different direction than she wanted to go." [Doc. 31-1 at pp. 3–4].

## **DISCUSSION**

As previously mentioned, Defendants filed a Motion for Summary Judgment. [Doc. 26]. First, the Court will explain the standard of review for a motion for summary judgment. Second, the Court will show that Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim, because the harassment was not severe and pervasive enough to constitute a hostile work environment. Finally, the Court will describe the standard for a retaliation claim under the False Claims Act and explain that Defendants are entitled to summary judgment, because Plaintiff did not engage in protected activity.

### A. **Standard of Review**

Defendants are entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The Court must view facts in the light most favorable to the non-moving party and accept his version of the facts when they are in dispute. *Scott v. Harris*, 550 U.S. 372, 379 (2007) (citing Fed. R. Civ. P. 56(c)). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of [her] case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant may (1) simply point out an absence of evidence to support the non-moving party's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove [her] case at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present *affirmative evidence* to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17) (emphasis added). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the [non-moving] party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248, (1986)). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (internal quotations omitted). With the foregoing standard in mind, and with careful consideration of the facts as outlined above and the applicable law, the Court rules as follows.

B.      **Hostile Work Environment**

Plaintiff alleges that she worked in a hostile work environment at Upson. "To establish a hostile work environment claim under . . . 42 U.S.C. § 1981, an employee (or former employee) must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [his or her] employment.'" *Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 133 (2004)). This requires Plaintiff to prove the following:

> (1) that he [or she] belongs to a protected group; (2) that he [or she] has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Bryant*, 575 F.3d at 1296 (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Plaintiff meets the first three elements and the fifth element. Plaintiff is an American of Colombian descent, so she is clearly a member of a protected group due to

8

her national origin.[6] *See Bryant*, 575 F.3d at 1296; [Doc. 29, Vazquez Depo., 146:19–21]. Second, the "Mexican sandwich," green card, and DACA comments could all be reasonably viewed as unwelcome harassment.[7] *See* [Doc. 30-3 at ¶ 50]. Third, these comments obviously refer to Plaintiff's national origin. [Doc. 30-3 at ¶50]; [Doc. 37, Penn Depo., 73:1–3]. Lastly, the Court assumes, for purposes of this motion, that Plaintiff's employer would be responsible for the work environment.

Thus, Plaintiff's claim turns on whether she has produced enough evidence to show that the harassment suffered altered the terms and conditions of her employment by being so severe or pervasive that it created a discriminatorily abusive working environment. Plaintiff failed to prove this element.

In deciding hostile work environment claims, courts frequently remind litigants that "[§ 1981] is not a general civility code, and simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not constitute a hostile work environment."[8] *Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 806 (11th Cir. 2012)

---

[6] Plaintiff's parents are both from Colombia, but she was born in the United States.

[7] The Court is skeptical with regard to whether the other four occurrences Plaintiff listed as supporting her hostile work environment claim could reasonably be based on Plaintiff's national origin. *See supra*, pp. 3–4. However, given that the Court must construe all inferences in Plaintiff's favor on Defendants' Motion for Summary Judgment, it will give Plaintiff the benefit of the doubt and consider them to be "unwelcome harassment."

[8] To set the analytical stage for a hostile work environment claim brought under 42 U.S.C. § 1981, the Court notes that these claims are subject to the same standards of proof and should be evaluated using the same framework applicable to hostile work environment claims asserted via Title VII. *Bryant*, 575 F.3d. at 1296.

9

(alterations, citation, and internal quotation marks omitted). The Court should view the conduct "in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of [a] plaintiff's employment and create a hostile work environment." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

To prove the harassment was sufficiently severe and pervasive, Plaintiff must show both an objective and a subjective component. *Miller*, 277 F.3d at 1276. Consequently, the behavior "must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive.'" *Id.* (quoting *Harris*, 510 U.S. at 21–22). In other words, "the employee must subjectively perceive the harassment as sufficiently severe and pervasive," and "this subjective perception must be objectively reasonable." *Guthrie*, 460 F. App'x at 806 (quoting *Mendoza*, 195 F.3d at 1246 (internal quotations omitted)).

Despite Defendants' arguments to the contrary, Plaintiff satisfies the subjective component. *See* [Doc. 26-1 at p. 11]. Plaintiff testified that, in response to Sally Barker's DACA comment, she "cringed. [She] had had quite enough of the demeaning belittlement directed at [her] in inappropriate racial non-humor." [Doc. 30-3 at ¶ 68]. In contrast, Penn testified that he believed the DACA and Mexican sandwich comments were joking or banter between two friends. [Doc. 37, Penn Depo., 71:3–22, 73:1–8].

10

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff subjectively perceived the harassment as sufficiently severe and pervasive.

Plaintiff, however, fails to prove the harassment she suffered was *objectively* severe and pervasive enough to alter the terms and conditions of her employment. To properly analyze the objective component, the Court will consider the following factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276 (citing *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997)).

First, the comments were not sufficiently frequent and severe. In *Fortson v. Carlson*, the Eleventh Circuit affirmed the district court's granting of summary judgment to a defendant on a plaintiff's § 1981 racially hostile work environment claim. 618 F. App'x 601, 608 (11th Cir. 2015). In that case, the plaintiff was subjected to "twelve incidents of harassment spanning seven months of [plaintiff's] two-and-a-half years of employment at Columbia Farms[,]" with only nine incidents involving racially derogatory language such as "black ass" or "black ass fool[.]" *Id.* at 607. All nine comments involved racial epithets, and some of the comments included threats like "I'll have your black ass taken care of" or "I'll take your black ass across the track[.]" *Id.* at 604. The Eleventh Circuit held that these instances were not sufficiently frequent or severe such that "a reasonable jury

could find the frequency of this harassing conduct to be sufficiently pervasive or severe[.]" *Id.* at 607.

Here, Plaintiff alleges seven instances of conduct in a period of roughly one year during her almost eight years of employment at Upson. *See* [Doc. 31 at p. 6]; *See* Factual Background, *supra*. The "Mexican sandwich" comments, DACA comments, and separate conversations with Long and Penn were the only instances that her supervisors (Long or Penn) were present for or that could be imputed to Upson for vicarious liability purposes.[9] Like the plaintiff in *Fortson*, Plaintiff has not provided sufficient to carry her burden of showing that the unwelcome harassment was either frequent or severe. *See Fortson*, 618 F. App'x at 607 (agreeing with the Middle District that no reasonable jury could find that plaintiff met the frequency or severity factors, because a plaintiff only raised nine incidents of racially derogatory language ("black ass" or "black ass fool") within a span of seven months); *C.f., Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251–54 (11th Cir. 2015) (holding that plaintiffs raised disputed issues that the harassment was frequent and severe, because plaintiffs heard racial slurs every day, saw racist graffiti in the bathroom daily, and saw confederate flags frequently or every day). The *Fortson* plaintiff suffered more incidents of harassment in a shorter period of time than Plaintiff. Hence, it only follows that if the plaintiff in *Fortson* failed, then Plaintiff must as well.

---

[9] According to Penn's testimony, he did not remember Sally Barker's green card comment, so neither Penn nor Upson may be directly or vicariously liable for it. *See* [Doc. 37, Penn Depo., at 73:9–16].

Accordingly, the Court finds that the alleged comments do not adequately demonstrate the requisite frequency to satisfy the *Fortson* standard.

Although it is a closer call on the severity factor, the Court determines that only three of Plaintiff's seven alleged harassment incidents can reasonably be described as somewhat approaching the requisite severity level. Specifically, Plaintiff describes three comments that could potentially be directed at her national origin: the Mexican sandwich, green card, and DACA comments. While the court easily finds these comments to be offensive and unworthy of a professional workplace, it cannot find them they were so severely offensive as to the second factor outlined in *Miller* and other similar cases.

Unlike the facially racist comments the plaintiff in *Fortson* suffered, the Court must draw inferences to consider the comments towards Plaintiff as racial epithets or directed toward her national origin. Consequently, as explained above, Plaintiff fails to create an issue of material fact as to the severity or frequency factors.

Considering the third factor, no reasonable jury could find that the comments towards Plaintiff were sufficiently physically threatening or humiliating harassment rather than merely offensive utterances. Again looking to *Fortson*, the coworkers there threatened plaintiff with phrases such as "I'll have your black ass taken care of … ." *See* 618 F. App'x at 607. Here, Plaintiff fails to allege any comment that could be considered physically threatening in the slightest. However, Plaintiff does allege in her affidavit that she "suffered damage in the form of humiliation[.]" [Doc. 30-3 at p. 18]. Further, Plaintiff

13

argues in her response brief that "she experienced humiliation and embarrassment being subjected to the totally unchecked disparaging public racial reference of [Sally] Barker, holding her up to public ridicule." [Doc. 30 at p. 16]. Nonetheless, the quote from Plaintiff's brief was devoid of a citation to the record. Moreover, she provides no context as to the circumstances of these alleged comments such as the number of people present, whether others (assuming more than she and the speaker were present) heard the comments, their reactions to the comments and so forth. While the Court assumes that she subjectively may have felt humiliated, one must recall that there is also an objective factor that the court must determine and weigh. In sum, without more than her affidavit focused on the subjective component of the test, the court does not find that a reasonable person would consider the seven comments to be particularly humiliating. In context, the conduct is not sufficient to raise an issue of material fact with regard to the third factor.

Finally, Plaintiff has failed to create an issue of material fact regarding whether the comments unreasonably interfered with her job performance. In *Guthrie v. Waffle House, Inc.*, the Eleventh Circuit found that a plaintiff failed to introduce evidence that the alleged harassment unreasonably interfered with plaintiff's ability to do her job when plaintiff maintained her employment "throughout the entire period of alleged harassment, and claims that she was a good worker throughout her tenure there." F. App'x at 808. Similarly, Plaintiff testified she "had not received or been told that any of [her] behaviors—leadership, professional, [or] as a director—[were] in question." [Doc.

29, Vazquez Depo., 94:15—95:7]. Additionally, Plaintiff testified that "they had just promoted me, they gave me another department. A few months prior, the CEO said I was, 100 percent wouldn't change anything about me." [*Id.* at 94:4–7]. This testimony, coupled with the fact that Plaintiff kept her job throughout the period of time encompassing all alleged instances of harassment (and was even promoted) sufficiently rebuts her self-serving affidavit testimony that the environment "plagued me, troubled me, lessened me and interfered with my ability to my job free of such intensity." [Doc. 30-3 at ¶ 72]; *See Williams v. City of Dothan, Ala.*, 745 F.2d 1406, 1415 n.9 (11th Cir. 1984) ("[S]ubjective and possible self-serving evidence must be viewed with a skeptical eye unless it is supported by more objective facts in the record"). Therefore, the Court can only conclude that Plaintiff has not produced sufficient evidence that the harassment sufficiently interfered with her job performance.

Considering these factors together, Plaintiff has failed as a matter of law to create an issue for the jury that the harassment she suffered was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. Consequently, her § 1981 hostile work environment claim fails as a matter of law. Thus, the Court **GRANTS** summary judgment to Defendants with regard to this claim.

## C. Retaliation Under False Claims Act

In addition to her hostile work environment claim, Plaintiff also alleges that Upson fired her in violation of the False Claims Act whistleblower provision. "The FCA's whistleblower provision provides relief to an employee who was 'discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop [one] or more violations of [the FCA].'" *Reynolds v. Winn-Dixie Raleigh, Inc.*, 620 F. App'x 785, 791 (11th Cir. 2015) (emphasis omitted) (quoting 31 U.S.C. § 3730(h)(1)). "In other words, protection under this provision requires a showing that a plaintiff was engaged in protected conduct and that the employer retaliated against him 'because of' that protected conduct." *Reynolds*, 620 F. App'x at 791. Accordingly, Plaintiff "must establish that: (1) [Upson] is covered by the act, (2) [Plaintiff] engaged in protected conduct, (3) [Plaintiff] experienced adverse employment action, and (4) the adverse employment action is causally connected to [Plaintiff's] protected conduct." *Reynolds v. Winn-Dixie Raleigh, Inc.*, 85 F. Supp. 3d 1365, 1374 (M.D. Ga. 2015), *aff'd*, 620 F. App'x 785 (11th Cir. 2015).

To state a proper claim for retaliation, Plaintiff must first prove that she engaged in protected activity. "The prototypical example of conduct protected by the FCA is the filing of an FCA claim." *Ortino v. School Bd. Of Collier Cty.*, No. 14-cv-693-FtM-29CM,

16

2015 WL 1579460 at *2 (M.D. Fla. April 9, 2015). However, "[p]rotected activity may also include acts done 'in furtherance of' an action under the FCA or other efforts to stop violations of the FCA." *United States v. Miami Cancer Inst.*, No. 17-24051-Civ-Scola, 1019 WL 1993513 (S.D. Fla. May 6, 2019) (citing *United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 791 (11th Cir. 2018). Further, the FCA also "prohibits retaliation against an employee who 'put her employer on notice of possible [FCA] litigation by making internal reports that alert the employer to fraudulent or illegal conduct,' even if an FCA claim is never filed." *Ortino*, 2015 WL 1579460, at *2 (quoting *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 (11th Cir. 2010)). But, the "[m]ere reporting of wrongdoing to supervisors, without alleging that the wrongdoing constitutes fraud on the government, does not qualify as protected conduct." *Ortino*, 2015 WL 1579460, at *2. "Though Congress amended the FCA in 2009 to broaden the scope of 'protected activity' under the FCA retaliation provision, the activity must still be aimed at stopping an FCA violation." *United States v. LifePath Hospice, Inc.*, No. 8:10-cv-1061-T-30TGW, 2016 WL 5239863, at *10 (M.D. Fla. September 22, 2016) (citing *United States v. Wellcare Health Plans, Inc.*, No. 8:15-cv-65-T-30EAJ, 2016 WL 1077359, at *4 (M.D. Fla. March 18, 2016)).

Despite her arguments to the contrary, Plaintiff fails to establish she engaged in protected activity when she notified Dr. Boyce that three of Dr. Williams' patients were being kept longer than medically necessary, and when she opined to Dr. Boyce that she

17

thought they needed a peer review on three patients' charts. [Doc. 36, Boyce Depo., 17:19—18:3, 19:1–4]. "A plaintiff must do more than investigate or complain about an employer's improper conduct; a plaintiff must have specifically investigated or complained about the employer making false claims for federal funds[.]" *Bouknight v. Houston Ind. Sch. Dist.*, Civil Action No. H-06-1057, 2008 WL 110427, at *4 (S.D. Tex. January 8, 2008). Consequently, while internal reports may give rise to an FCA retaliation claim, the reports must specifically address "fraudulent claims for federal funds and not simply general misconduct." *Hale v. Moreland Altobelli Assocs., Inc.*, Civil Action No. 1:14-cv-00065-WCO, 2014 WL 12235187, at *6 (N.D. Ga. September 4, 2014). Plaintiff's opinion regarding the necessity of a peer review on Dr. Williams fails to meet the aforementioned standards, because she did not state anything about false claims for federal funds when she internally reported the information to Dr. Boyce. Plaintiff never mentioned she was planning on pursuing an FCA claim on behalf of the government or disclosing the alleged deficiencies with Dr. Williams' practice to the government. Plaintiff merely mentioned concerns with a few patients and their length of stay. [Doc. 36, Boyce Depo., 17:25—18:3]. This is a far cry from "put[ting] her employer on notice of possible [FCA] litigation by making internal reports that alert the employer to fraudulent or illegal conduct." *See ex rel. Sanchez*, 596 F.3d at 1303. Therefore, the Court **GRANTS** summary judgment to Defendants with regard to Plaintiff's retaliation claim under the FCA, because she failed to engage in protected activity.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 26]. Plaintiff failed to raise a disputed issue of material fact with regard to her § 1981 hostile work environment claim, FCA retaliation claim, or her § 1981 racial discrimination claim. Therefore, Defendants are entitled to summary judgment on all claims, and the Court **DIRECTS** the Clerk of Court to close this case.

**SO ORDERED**, this 22nd day of October, 2019.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**